**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

**BELTRONICS USA, INC.,**

    **Plaintiff,**

    v.                                Case No.  07-2440-JWL

**MIDWEST INVENTORY
DISTRIBUTION LLC, et al.,**

    **Defendants.**

**MEMORANDUM AND ORDER**

This lawsuit involves claims by plaintiff Beltronics USA, Inc. against defendants Midwest Inventory Distribution, LLC, i-Net Distributors, Audio Video Man, Kevin Burke, and Steve Webb for trademark infringement and unfair competition arising from defendants' alleged use of plaintiff's federally registered BELTRONICS trademark. Beltronics obtained an ex parte seizure order authorizing the seizure of Beltronics and/or Escort branded radar detectors bearing counterfeit labels as well as related documentation from defendants, and that seizure was carried out on September 26, 2007. This matter is now before the court on defendants' motion to dissolve the seizure order and return property (doc. #21) as well as plaintiff's motion for a preliminary injunction (doc. #4). The court conducted a hearing on these motions on October 10, 2007, and October 31, 2007. After careful consideration of the evidence and the parties' arguments, the court is now prepared to rule. For the reasons explained below, the court will dissolve the seizure order, direct Beltronics to return the

seized property to defendants, and grant a preliminary injunction prohibiting defendants (1) from selling or offering for sale any Beltronics goods which do not bear an original Beltronics serial number label and (2) from destroying, modifying, moving, hiding, or otherwise making any such goods inaccessible during the course of this litigation.

## BACKGROUND

Plaintiff Beltronics USA, Inc. is a provider of after-market vehicle electronics, including radar detectors. It is the owner of the registered trademarks BELTRONICS for, among other things, police radar and laser detectors. Beltronics became aware of the sale via the Internet of Beltronics radar detectors bearing phony serial number labels. This came to Beltronics' attention via customer warranty inquiries seeking to return units for repair. Beltronics traced the origin of these units to defendant Midwest Inventory Distribution, LLC and related eBay sellers who are named as defendants in this lawsuit (collectively, "Midwest"), all of whom are affiliated with defendants Kevin Burke and Steve Webb. Based on these allegations, plaintiff's complaint asserts claims against defendants for (1) counterfeiting and federal trademark infringement in violation of 15 U.S.C. § 1114; (2) false designation of origin in violation of 15 U.S.C. § 1125; and (3) trademark infringement, unfair competition, and passing off in violation of state law.

Immediately upon filing this lawsuit, plaintiff filed an ex parte application seeking a seizure order pursuant to 15 U.S.C. § 1116(d). On September 20, 2007, the Honorable

Carlos Murguia, United States District Judge, issued a seizure order authorizing the following goods to be seized:

> Beltronics and/or Escort[1] branded radar detectors including but not limited to model RX65 radar detectors bearing counterfeit labels or other counterfeit components, including those records documenting the manufacture, sale, or receipt of things involved in such detectors, counterfeit labels or other counterfeit components.

On September 26, 2007, Beltronics' attorneys conducted this seizure in conjunction with Deputy United States Marshals. They seized Beltronics radar detectors and four to five boxes of paper documents and downloaded computer files.

On October 9, 2007, defendants filed a motion to dissolve the seizure order, arguing that the items seized by Beltronics do not bear a "counterfeit mark" as statutorily defined, that defendants own a reputable business and there is no risk that they will destroy or make inaccessible the Beltronics products in question, and that during the seizure counsel for Beltronics abused the authority granted by the seizure order. Defendants ask the court to order Beltronics to return all of the property seized from them. They contend that they have never affixed to any product sold by them any Beltronics mark, or any label bearing a Beltronics mark or purporting to bear a Beltronics serial number. Midwest receives all of its Beltronics products from two different distributors: Eagle Distributors, Inc. and R&D Distribution, Inc. Defendants believe that both Eagle and R&D are distributors who are authorized to use the Beltronics mark. And, they state that the Beltronics products sold by

---

[1] Beltronics is a wholly owned subsidiary of Escort, Inc., but Escort is not a named plaintiff in this lawsuit.

them are genuine Beltronics products that bear no marks other than those existing when those authorized Beltronics distributors ship them to Midwest.

On October 10, 2007, the court held an evidentiary hearing on the motion to dissolve the seizure order. At the end of the hearing, on agreement by counsel, the court continued the hearing and consolidated it with a hearing on plaintiff's motion for a preliminary injunction. The court reconvened the hearing on October 31, 2007, and continued to hear evidence and argument on the pending motions. At the conclusion of the hearing the court took both motions under advisement. After careful consideration of the evidence and arguments presented by the parties, the court is now prepared to rule.

## MOTION TO DISSOLVE SEIZURE ORDER AND RETURN PROPERTY

The Lanham Act authorizes a district court to grant an ex parte order for the seizure of items involved in the unlawful use of a counterfeit mark, including goods, counterfeit marks, the means of making such marks, and records. 15 U.S.C. § 1116(d)(1)(A). Under the procedure specified in § 1116(d), a court that issues an ex parte seizure order must schedule a hearing, on notice to the defendant, within a certain time period after the date the seizure order is issued. 15 U.S.C. § 1116(d)(10)(A). At that hearing, the party who obtained the order "shall have the burden to prove that the facts supporting findings of fact and conclusions of law necessary to support such order are still in effect." *Id.* In order to continue the seizure order, the court must make the following findings:

>(i) an order other than an ex parte seizure order is not adequate to achieve the purposes of section 1114 of this title;
>(ii) the applicant has not publicized the requested seizure;
>(iii) the applicant is likely to succeed in showing that the person against whom seizure would be ordered used a counterfeit mark in connection with the sale, offering for sale, or distribution of goods or services;
>(iv) an immediate and irreparable injury will occur if such seizure is not ordered;
>(v) the matter to be seized will be located at the place identified in the application;
>(vi) the harm to the applicant of denying the application outweighs the harm to the legitimate interests of the person against whom seizure would be ordered of granting the application; and
>(vii) the person against whom seizure would be ordered, or persons acting in concert with such person, would destroy, move, hide, or otherwise make such matter inaccessible to the court, if the applicant were to proceed on notice to such person.

*Id.* § 1116(d)(4)(B). If the party who obtained the order does not meet its burden of proof, "the seizure order shall be dissolved or modified appropriately." *Id.* § 1116(d)(10)(A).

Here, dissolution of the seizure order is warranted on the grounds that the court is not satisfied that defendants would destroy, move, hide, or otherwise make the seized goods inaccessible, or that an order other than an ex parte seizure order would not be adequate to ensure that Beltronics will have adequate remedies if defendants are ultimately found to have infringed Beltronics' trademark. In this respect, this case is much like *Lorillard Tobacco Co. v. Bisan Food Corp.*, 377 F.3d 313, 319-22 (3d Cir. 2004). There, the district court refused to issue, at the request of cigarette manufacturer Lorillard Tobacco Co., ex parte orders directing the seizure from three New Jersey retailers of allegedly counterfeit Newport brand cigarettes. The Third Circuit affirmed the district court's refusal to issue the seizure orders. The court reasoned that there was no evidence that the defendants had previously failed to

5

appear in court when required to do so; there was no prior legal action against them; there was not even the suggestion that small independent retailers with fixed places of business (like defendants) are as a class unlikely to comply with a court order; and the defendants were incorporated businesses with inventories, assets, and a fixed physical presence who had much to lose if held in contempt. In contrast, in *Vuitton v. White*, 945 F.2d 569, 575 (3d Cir. 1991), the Third Circuit held that the district court abused its discretion by refusing to issue a seizure order where the district court found, among other things, that the plaintiff Vuitton had shown that the defendants were likely to destroy or hide evidence if given notice of the proceedings. The court noted that the defendants had failed to appear in Vuitton's first enforcement action despite actual notice and that at least four of the street vendor defendants apparently were selling counterfeits in violation of the permanent injunction from an earlier action. *See also* 5 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 30:37 (4th ed. 2007) (quoting legislative history that the congressional sponsors believed that ex parte seizures are a necessary tool to thwart the bad faith efforts of fly-by-night defendants to evade the jurisdiction of the court).

The facts of this case are much more like those of *Lorillard* than those in *Vuitton*. Here, there is no evidence from which the court could find that it clearly appears from specific facts that defendants have at any time previously failed to appear in court when required to do so, that there is any prior legal action against them, or that there is any other indicia that they are unlikely to comply with a court order. They are incorporated businesses with inventories, assets, and a fixed physical presence. They sell merchandise other than

6

Beltronics equipment. Thus, they have much to lose if held in contempt. Although the evidence suggests that defendants' methods of doing business with respect to their sales of Beltronics products might be less than ideal, there is simply no evidence in the record from which the court can find that defendants are the type of fly-by-night defendants who will seek to evade the court's jurisdiction. They have appeared in this action, they are represented by competent reputable counsel, and they appear to sincerely believe that they have done nothing wrong. Consequently, the court cannot find that it clearly appears from specific facts that an order other than an ex parte seizure order is not adequate to achieve the purposes of 15 U.S.C. § 1114. On the grounds that Beltronics has not made the showings required by § 1116(d)(4)(B)(i) & (vii), then, the court will dissolve the seizure order and direct Beltronics to return the seized goods to defendants no later than **November 16, 2007**.

Defendants also contend that the scope and conduct of the seizure was abusive and that Beltronics violated the order in several respects in the manner in which it was carried out. Even if true, that consideration does not fall within the list of items set forth in § 1116(d)(4)(B) so as to provide a valid basis to dissolve the seizure order. Rather, the substantive thrust of defendants' arguments in this respect is that the seizure was wrongful. As such, their remedy is a cause of action for wrongful seizure as provided in 15 U.S.C. § 1116(d)(11) ("A person who suffers damage by reason of a wrongful seizure under this subsection has a cause of action against the applicant for the order under which such seizure was made . . . ."). *See Waco Int'l, Inc. v. KHK Scaffolding Houston Inc.*, 278 F.3d 523, 531 (5th Cir. 2002) (noting that § 1116(d)(11) is the statute that governs whether a seizure order

7

is wrongful); *Martin's Herend Imports, Inc. v. Diamond & Gem Trading United States of Am. Co.*, 195 F.3d 765, 774-75 (5th Cir. 1999) (same). Thus, to the extent that defendants argue that the wrongful seizure constitutes grounds for any form of affirmative relief other than dissolution of the seizure order,[2] their motion is denied at this procedural juncture. But they are, of course, free to pursue their counterclaim against Beltronics for wrongful seizure pursuant to § 1116(d)(11).[3]

## MOTION FOR A PRELIMINARY INJUNCTION

Under the Lanham Act, a court may grant an injunction "according to the principles of equity and upon such terms as the court may deem reasonable." 15 U.S.C. § 1116(a). A plaintiff seeking a preliminary injunction must establish: (1) a substantial likelihood of success on the merits, (2) that the plaintiff will suffer irreparable injury if the preliminary injunction is denied, (3) that the threatened injury to the plaintiff outweighs the injury to the

---

[2] For example, in defendants' reply brief they seek an order awarding them the bond posted by plaintiff and setting a hearing to determine defendant's full scope of damages.

[3] Defendants also argue that the court should suppress any evidence obtained as a result of the seizure because Beltronics abused the authority granted by the seizure order by virtue of the manner in which the seizure was carried out. The court is most certainly concerned with the manner in which the seizure was carried out, most notably by the fact that it was largely conducted by counsel for Beltronics and resulted in the seizure of numerous documents and computer files which do not fall within the scope of the seizure order. Nonetheless, the court will not decide the propriety of suppression at this procedural juncture because the court is dissolving the seizure order and directing the return of defendants' property in any event. Additionally, defendants did not raise this suppression argument in connection with their response to plaintiff's motion for a preliminary injunction.

defendant(s) caused by the preliminary injunction, and (4) that an injunction is not adverse to the public interest. *Aid for Women v. Foulston*, 441 F.3d 1101, 1115 (10th Cir. 2006). Because a preliminary injunction is an extraordinary remedy, the right to relief must be clear and unequivocal. *Id.*

### A.     **Likelihood of Success**

The relevant facts concerning whether defendants are committing a violation of the Lanham Act by virtue of the manner in which they are selling Beltronics radar detectors appear to be relatively undisputed. They purchase radar detectors manufactured by Beltronics from Eagle Distributors, Inc. and R&D Distribution, Inc. Both Eagle and R&D are authorized Beltronics distributors, but Midwest is located outside of the geographic territory within which Eagle and R&D are supposed to be selling Beltronics merchandise to dealers. Consequently, by selling Beltronics products to Midwest, Eagle and R&D are violating the terms of their distributor agreements with Beltronics. In order to prevent Beltronics from detecting this unauthorized distribution, the serial number labels on the radar detectors are either replaced with phony serial number labels or removed altogether. Then, defendants sell the radar detectors on the Internet. It is Beltronics' policy to not provide product and service assistance, product use information, software upgrades, warranty, rebates, and recalls for products without legitimate serial numbers. Consequently, when the products are sold without legitimate serial numbers, they do not carry with them the bundle of services and product features that would otherwise be associated with the sale of genuine Beltronics radar detectors. In fact, Beltronics came to learn about the unauthorized sale of

these Beltronics radar detectors when end users contacted Beltronics to obtain warranty service, and those customers became irate when they learned that they were not entitled to any warranty from Beltronics. Defendants seek to downplay the significance of this fact, as they point out that their eBay advertisement prominently discloses that the serial number has been removed, that Beltronics will not honor the manufacturer warranty, and that defendants will provide a replacement warranty instead. The issue, then, is whether under these facts and circumstances Beltronics is likely to prevail on the merits of one of its Lanham Act claims.

The unauthorized use of any reproduction, counterfeit, copy, or colorable imitation of a registered trademark in a way that is likely to cause confusion in the marketplace concerning the source of the different products constitutes trademark infringement under the Lanham Act. *Australian Gold, Inc. v. Hatfield*, 436 F.3d 1228, 1239 (10th Cir. 2006); *First Sav. Bank, F.S.B. v. First Bank Sys., Inc.*, 101 F.3d 645, 650 (10th Cir. 1996). Nationwide trademark protection fosters competition and product quality by securing to the producer the benefits of a good reputation. *First Sav. Bank*, 101 F.3d at 650. It benefits the consumer by preventing confusion about the source of products, and by instilling in consumers the confidence that inferior goods are not being passed off by the use of a familiar trademark. *Id.*

Defendants' predominant theory of defense is that there is no likelihood of confusion concerning the source of the Beltronics radar detectors because it is undisputed that they are selling genuine Beltronics radar detectors that were manufactured by Beltronics, regardless

10

of whether those products bear a phony serial number label or no serial number label at all. Based on this theory, defendants contend that they are protected from trademark infringement claims under the "first sale" doctrine. Generally, a producer's right to control distribution of its trademarked product does not extend beyond the first sale of the product and, therefore, resale by the first purchaser of an original article under the producer's trademark does not constitute trademark infringement. *Australian Gold, Inc.*, 436 F.3d at 1240-41. "It is the essence of the 'first sale' doctrine that a purchaser who does no more than stock, display, and resell a producer's product under the producer's trademark violates no right conferred upon the producer by the Lanham Act." *Id.* at 1241 (quotation omitted). Thus, there is no Lanham Act violation when a purchaser resells a trademarked article under the producer's trademark, and nothing more. *Id.*

It is generally settled among the Courts of Appeals, however, that the first sale doctrine does not apply "when an alleged infringer sells trademarked goods that are materially different than those sold by the trademark owner." *Davidoff & CIE, S.A. v. PLD Int'l Corp.*, 263 F.3d 1297, 1302 (11th Cir. 2001). "[A] materially different product is not genuine and therefore its unauthorized sale constitutes trademark infringement." *Id.* & n.5 (collecting cases and noting that infringement by materially different products is not limited to gray goods cases). The rationale behind this exception to the first sale doctrine is grounded in the purposes of the Lanham Act: materially different products that have the same trademark may confuse consumers and erode consumer goodwill toward the mark. *Id.* at 1302. "A material difference is one that consumers consider relevant to a decision about

11

whether to purchase a product." *Id.* The threshold of materiality must be kept low to include even subtle differences between products because a myriad of considerations may influence consumer preferences. *Id.*

Here, the court finds that the removal or alteration of the original serial numbers on the Beltronics radar detectors being sold by defendants causes a likelihood of confusion concerning the source of the Beltronics products because consumers with full knowledge of the implications of such an alteration would likely consider those facts to be relevant to their decision about whether to purchase the product. For example, *Intel Corp. v. Terabyte Int'l, Inc.*, 6 F.3d 614 (9th Cir. 1993), involved a lawsuit brought by a manufacturer of math coprocessors (Intel) against a computer components broker (Terabyte) which sold coprocessors to end users. In that case, Terabyte had relabeled Intel coprocessors from slow chips and sold them as fast (and more expensive) chips. *Id.* at 619. Terabyte argued that there was no confusion as to the source of the product, namely Intel. *Id.* The Ninth Circuit disagreed, explaining that Terabyte's argument improperly ignored the good will, reputation, and consumer protection functions associated with a particular trademark. *Id.* The court explained that Intel's math coprocessors were relabeled to deceive the public, and by distributing those products as particular genuine Intel math coprocessors, Terabyte threatened Intel's reputation and good will and deceived its customers who believed they were purchasing those particular models of math coprocessors. *Id.* at 620. The facts of this case are similar in the sense that the relabeling (or un-labeling, as the case may be) of the serial number labels on the radar detectors deceives the public who believe they are purchasing a

genuine Beltronics product along with the full bundle of services and product features that would typically accompany such a purchase. When they later learn that they did not receive the full bundle of services and product features, their displeasure at Beltronics erodes Beltronics' good will and reputation.

As an example of similar circumstances which would not involve a likelihood of confusion, the case of *Matrix Essentials, Inc. v. Emporium Drug Mart, Inc.*, 988 F.2d 587 (5th Cir. 1993), involved the sale of genuine Matrix specialty hair-care products through unauthorized distribution channels—namely, the products were being sold through a retail drug store rather than through licensed cosmetologists. There, the court found no likelihood of consumer confusion. *Id.* at 591. The court distinguished other cases involving sales of purportedly "genuine" goods by unauthorized dealers because those cases involved potential quality defects in the products themselves of which a consumer would not necessarily be aware. *Id.*; *see, e.g.*, *Shell Oil Co. v. Commercial Petroleum, Inc.*, 928 F.2d 104, 107 (4th Cir. 1991) (defendant was prohibited from selling bulk oil under Shell trademarks because the distributor did not observe the strict tank and line cleaning requirements that Shell required of its authorized distributors to ensure that the oil was not subjected to residue impurities); *El Greco Leather Prods. Co. v. Shoe World, Inc.*, 806 F.2d 392 (2d Cir. 1986) (imported shoes were not "genuine" where they had not undergone the careful quality inspection normally required); *Adolph Coors Co. v. A. Genderson & Sons, Inc.*, 486 F. Supp. 131 (D. Colo. 1980) (Coors beer was not "genuine" where unauthorized distributor did not maintain careful refrigeration requirements necessary to prevent deterioration in light of lack

of preservatives). Similarly, here, although the Beltronics radar detectors are theoretically genuine in the sense that they were manufactured by Beltronics, their overall quality has been altered because they do not carry with them the bundle of services and product features that would otherwise be associated with the sale of genuine Beltronics radar detectors such as product and service assistance, product use information, software upgrades, warranty, rebates, and recalls. And, this is the type of latent quality defect of which a consumer would not necessarily be aware at the time of purchase. In this sense, then, the facts of this case are distinguishable from *Matrix Essentials*.

This rationale applies with equal force not only to those Beltronics goods bearing phony serial numbers, but also insofar as defendants are selling products with the Beltronics serial number labels removed. In *Davidoff & CIE, S.A. v. PLD Int'l Corp.*, 263 F.3d 1297 (11th Cir. 2001), an authorized distributor of fragrances obliterated the batch code from fragrance bottles by etching the glass. The Eleventh Circuit upheld the district court's finding that etching the glass to remove the batch code degraded the appearance of the product and created a likelihood of confusion by making the consumer think that the product had been harmed or tampered with. *Id.* at 1303. Although removal of the serial number labels in this case is different in the sense that in *Davidoff* obliteration of the label created an issue of deficient aesthetic quality whereas in this case the removal of the label creates an issue of deficient quality in the performance of the goods, both scenarios implicate quality control. And, "[o]ne of the most valuable and important protections afforded by the Lanham Act is the right to control the quality of the goods manufactured and sold under the holder's

14

trademark." *El Greco Leather Prod. Co.*, 806 F.2d at 395; *accord Intel Corp.*, 6 F.3d at 618. Thus, removal of the label, just like replacement of the label, creates consumer confusion and erodes consumer goodwill toward the Beltronics mark because it involves a material difference that a consumer would consider relevant to a decision about whether to purchase a product.

According to defendants, when they advertise their product on the Internet they disclose that the manufacturer will not honor the manufacturer warranty and that, in lieu thereof, defendants provide a one-year replacement warranty. But, based on the evidence presented, the court is unpersuaded that defendants' warranty policies are necessarily disclosed to consumers in a manner that is sufficient to ameliorate any confusion. Beltronics became aware of defendants' practices with respect to Beltronics radar detectors by way of customer warranty inquiries seeking to return units for repair, and those units appear to have come from defendants. This undercuts defendants' argument that they consistently disclose their warranty policy in a prominent manner. Moreover, the radar detectors which were seized do not contain any written disclosures concerning defendants' warranty policy. Additionally, the lack of a manufacturer's warranty is not the only implication associated with Beltronics products not bearing legitimate serial number labels. Customers also do not receive product and service assistance, product use information, software upgrades, rebates, and recalls. Thus, the court is unpersuaded that defendants' alleged disclosures to consumers concerning the product warranty are sufficient to ameliorate this confusion.

In sum, the court finds that defendants' practices relating to phony or removed serial number labels on the Beltronics radar detectors are likely to cause confusion in the marketplace concerning the source of the goods. Accordingly, Beltronics has shown a substantial likelihood that it will prevail on the merits of its trademark infringement claim against defendants.

**B.**     **Irreparable Harm**

To constitute irreparable harm, an injury must be certain, great, actual, and not theoretical. *Schrier v. University of Colo.*, 427 F.3d 1253, 1267 (10th Cir. 2005). Irreparable harm is more than merely serious or substantial harm. *Id.* The party seeking injunctive relief must show that the injury complained of is of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm. *Id.*

Here, the declaration of Michael Kennedy, Direct Sales and Customer Service Manager for Beltronics, states that customers who have contacted Beltronics and been told that they are not entitled to a warranty and have been denied rebates, recalls, and software upgrades state that they believe they have been deceived. They become irate about having been duped into purchasing an illegitimate product that does not carry with it warranty, rebates, recalls, and software upgrades, and have expressed distaste for Beltronics. They have expressed a belief that Beltronics is responsible for their displeasure. Moreover, Beltronics cannot determine how many customers will be misdirected, confused, and harmed by this conduct. Additionally, Ron Gividen, e-Commerce Business Manager for Beltronics, testified that he has received feedback from those types of customers and their reaction "is

16

not positive. They are actually very frustrated, to say the least. Some get quite angry." Based on the evidence presented, the court finds that Beltronics has met its burden of showing irreparable injury by showing a likelihood of confusion, that the reputation of its mark has been and is being tarnished, and that it will likely lose customer goodwill. These considerations constitute irreparable harm because the injuries cannot be calculated in monetary terms.

**C.     Balance of Harms**

Next, the court looks at whether the threatened injury outweighs the harm that the preliminary injunction may cause defendant. Defendants contend that Beltronics is a huge corporation whereas they are the quintessential "small fish" (or small business) that is vulnerable to the effects of a preliminary injunction because they would be foreclosed from selling two product lines and would be stigmatized in the eyes of their distributors and customers. But, the court is not contemplating whether to preclude defendants from selling Beltronics radar detectors altogether. The court is only considering the propriety of an injunction prohibiting them from selling Beltronics products in a manner that appears to constitute trademark infringement. If defendants can procure Beltronics radar detectors bearing legitimate serial numbers, they can of course continue to sell those product lines. In comparison, in the absence of an injunction defendants will likely continue to sell their current volume of business, which appears to be in the hundreds of units each year. And, Beltronics will continue to suffer the loss of reputation and customer goodwill associated with those sales. On balance, this factor weighs in favor of granting the injunction.

**D.     Public Interest**

Finally, Beltronics must demonstrate that issuance of an injunction is not adverse to the public interest. It is well settled that trademark protection fosters competition and product quality by securing to the producer the benefits of a good reputation, and it benefits the consumer by preventing confusion about the source of products, and by instilling in consumers the confidence that inferior goods are not being passed off by the use of a familiar trademark. *First Sav. Bank, F.S.B. v. First Bank System, Inc.*, 101 F.3d 645, 650 (10th Cir. 1996). Accordingly, it is not adverse to the public interest to enforce those trademark protections here. *Cf. Autoskill Inc. v. Nat'l Educ'l Support Sys., Inc.*, 994 F.2d 1476, 1498 (10th Cir. 1993) ("In copyright cases, we think [the public interest] factor normally weighs in favor of the issuance of an injunction because the public interest is in the interest in upholding copyright protections.").

**E.     Conclusion**

In conclusion, the court is persuaded that Beltronics has met its burden of proving that all four of the preliminary injunction factors weight in its favor. Beltronics has shown a likelihood of success on the merits in that the alteration of the original serial number labels results in defendants selling trademarked goods that are materially different than those sold by Beltronics. Additionally, Beltronics has shown that it will likely suffer irreparable injury in the form of damage to its reputation and customer goodwill if the preliminary injunction is denied. The balance of harms weigh in favor of Beltronics, particularly in light of the fact that the court's order will not preclude defendants from selling legitimately labeled

Beltronics radar detectors. And, issuing a preliminary injunction enforcing legitimate trademark protections is not adverse to the public interest. Accordingly, the court will grant a preliminary injunction prohibiting defendants from selling or offering for sale any Beltronics goods which do not bear an original Beltronics serial number label. In addition, in order to ensure the preservation of evidence notwithstanding the court's dissolution of the seizure order, the court hereby orders that defendants are prohibited from destroying, modifying, moving, hiding, or otherwise making any such goods inaccessible during the course of this litigation.

**IT IS THEREFORE ORDERED BY THE COURT** that defendants' motion to dissolve the seizure order and return property (doc. #21) is granted.

**IT IS FURTHER ORDERED** that plaintiff's motion for a preliminary injunction (doc. #4) is granted to the extent that the court hereby orders that during the course of this litigation defendants are prohibited (1) from selling or offering for sale any Beltronics goods which do not bear an original Beltronics serial number label and (2) from destroying, modifying, moving, hiding, or otherwise making any such goods inaccessible during the course of this litigation.

**IT IS FURTHER ORDERED** that the bond previously posted by plaintiff as security for the seizure order shall remain posted as security for the preliminary injunction.

**IT IS SO ORDERED** this 13th day of November, 2007.

                                                  s/ John W. Lungstrum
                                                John W. Lungstrum
                                                United States District Judge